IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 14, 2017 Session

## ROBERT HARVEY SANTEE v. STACY LYNN SANTEE

**Appeal from the Chancery Court for Sevier County**
**No. 13-9-285      Telford E. Forgety, Jr., Chancellor**

---

### No. E2016-02535-COA-R3-CV

---

This appeal concerns divorce and child support matters. Robert Harvey Santee ("Husband") sued wife Stacy Lynn Santee ("Wife") for divorce in the Chancery Court for Sevier County ("the Trial Court"). After a trial, the Trial Court awarded Husband a divorce based upon Wife's inappropriate marital conduct. The Trial Court divided the marital estate, awarded Wife rehabilitative alimony, and imputed income to her for child support purposes. Wife appealed to this Court, arguing that, among other things, as a stay-at-home mother in a long-term marriage, rehabilitative alimony is insufficient. Husband argues in response that he has longstanding plans to retire. We find that the Trial Court erred in imputing income to Wife for two years of child support purposes when the Trial Court also found that Wife was capable of going to school for those two years to improve her financial situation and awarded rehabilitative alimony for Wife to do exactly that. Otherwise, we affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, J., joined, and CHARLES D. SUSANO, JR., J., filed a separate concurring and dissenting opinion.

Keith A. Hopson, Kingsport, Tennessee, for the appellant, Stacy Lynn Santee.

Andrew N. Wilson, Sevierville, Tennessee, for the appellee, Robert Harvey Santee.

# OPINION

## Background

The parties married in 1990. Husband is a radiologist who earns around half a million dollars per year. Wife, a high school graduate, was a stay-at-home parent. Wife sold some Mary Kay products during the marriage, but she lost money doing so. Five children were born of the marriage, but only one was a minor at the time of trial. This child, Tavyn, was born in 2000. Wife acknowledged having had an adulterous relationship, which began in 2012. Husband sued for divorce in September 2013. This case was tried over the course of two days in August 2016.

Wife testified to her very limited work history:

Q. Now, in the course of all this time of the marriage, did you ever work outside the home, or would --
A. No.
Q. -- you stay at home?
A. I stayed at home.
Q. How did you see your role and Dr. Santee's role in supporting this family and the home?
A. He is a great provider. He always made sure the kids were taken care of, there was food on the table, there was -- you know, we had vacations, everything. He -- excuse me -- he wasn't emotionally there, but he was -- he always took care of us that way. I have always volunteered at school. I've always been hands-on with my kids because I think that that's my goal. That was my -- that's my biggest accomplishment in my life, is my children and taking care of their needs and being there. And they know if they pick up the phone and say, "I need," or "I want," I'm there, period.

Husband testified as to whether Wife worked during the marriage, and his blunt testimony reflects the difficult circumstances under which the marriage ended:

Q. All right. Now, how many jobs outside the home has she had since you and she have been married?
A. She sold Mary Kay products.
Q. And do you know what income she made from that?
A. She lost money with that. She left her -- she did not go out and do what her manager told her to do, which was to have parties and whatnot to get

-2-

people to buy her product, so that her product sat around, especially when she started screwing around with Chad Hopson, and the product expired. It was over $10,000 worth of product that had to be thrown away.

Q. Well, before all of that, what other jobs did she hold outside the home to produce a meaningful income?

A. None.

Q. None. So as far as you know, she has no real ability to earn an income anywhere close to the lifestyle that you and she had, does she?

A. She would have to go get a lot of schooling in order for that to happen.

Q. So the answer to my question is?

A. Is no.

Regarding certain marital debts, the division of which is an issue in this appeal, Wife testified as follows:

Q. Okay. Let me talk to you about other assets that you and Dr. Santee have. There's a list of cars that we talked about and he had talked about as well. The Subaru to Dr. Santee and the Suburban to you, do you believe that's a fair --

A. Yes.

Q. -- distribution of those cars? The balance of the cars are in the hands of the children. Do you want the kids to be able to keep their car?

A. Yes, I do.

Q. Okay. Now, there's some debt associated with some of the cars?

A. Uh-huh.

Q. Were some of the cars bought after this divorce started?

A. Yes.

Q. And did you sign any of that debt?

A. No.

Q. Dr. Santee did?

A. Yes.

Q. Do you ask that he be required to pay those?

A. Yes.

***

Q. – aren't you? There is a couple of life insurance policies that Dr. Santee has. Probably one of them -- and I'm guessing rounded values of about $50,000. Now they're about maybe $200,000, if that, with a loan against one of them. I think he had testified yesterday it was -- may be on here. It was over $80,000.

-3-

A. Okay.

Q. Did you receive the benefit of any of the $80,000 loan that Dr. Santee took out against that life insurance policy --

A. No.

Q. -- at the start of this litigation?

A. No.

Q. I know he indicated he had some expenses he had to pay, including attorney fees. Do you ask the Court to treat that liability separate and not part of your liability?

A. Yes.

Husband testified to the expenses he had incurred since the case was filed as well as his overall financial status:

Q. Have you been paying the expenses since this case was filed almost three years ago, the household expenses, Dr. Santee?

A. Yes, whenever I received the bills from Stacey.

Q. And, again, you previously testified to that temporary agreed order dated November 1st, 2016, wherein you agreed to pay all the household expenses and the $2,100. Did you do that?

A. Yes.

Q. Each and every month?

A. Yes.

Q. All right. Now, that changed September the 17th, 2015, wherein the Court ordered $6,000 a month, and you recall you were not at that hearing, nor was I, and that was changed to $6,000. Do you recall that?

A. Yes.

Q. All right. Now, ultimately an agreed order was entered that modified that somewhat, that allowed those -- that alimony and the expenses to be paid from a joint marital account. Do you recall that?

A. Yes. I was barely able to pay the $2,100. There was no way I could pay the 6,000.

Q. All right.

A. So --

Q. Did you pay --

A. -- we took it from the joint --

Q. The question was did you pay from the joint account?

A. Yes.

Q. Okay. Now, from September up until April you paid that $6,000; is that correct?

A. Yeah.

-4-

Q. From what?

A. It was paid automatically from a Edward Jones joint account, as we agreed.

Q. All right. And did there come a period of time where that you no longer did that?

A. Yeah. The funds ran out. The trial got postponed. It was supposed to be in December. It was -- but then the trial got postponed. So the funds ran out.

Q. Total, all the expenses that you were paying each month, including the 6,000, all the household expenses, your expenses, what did those total each month, approximately?

A. I'd have to look at the statement. I think it was, like, 28,000.

Q. Monthly?

A. Yeah.

Q. All right. And I believe you said your take-home pay was about $9,500 twice a month. So that would be $19,000; is that correct?

A. Right.

Q. So were you able to cover that without dipping into the marital assets?

A. No.

Q. Now, Dr. Santee, what is it that you're asking? You're asking the Court to award you the divorce; is that correct?

A. Correct.

Q. And what are you asking? We've talked about some of these assets. The 529 we want to go to the children, for them to receive their vehicles. What is it that you're asking the Court to do with the other assets, generally, so the Court understands?

A. I think she -- she can stay in the house and have an equal amount of my retirement money set aside for me, then equitably divide up the rest of the retire[ment] money. And I think she needs to pay off a lot of the bills she ran up on her boyfriend. I shouldn't be having to pay that, as well as the -- I should get back some of the money that I had to pay Mr. Gass, the 20,000.

Q. You paid your wife's temporary attorney's fees in the amount of $20,000 --

A. Correct.

Q. -- is that correct?

A. Correct.

Q. Now, that November -- or excuse me. I think it was October 2015 order did allow for the Court to consider a reallocation of that amount that you paid, the 20,000; is that correct?

A. Correct.

Q. And you're asking the Court to have her pay that from the assets that are awarded her, and then you pay your attorney's fees?

A. Right.

Q. All right. And --

A. As far as alimony, I think I've paid a sufficient amount of alimony. She will have enough assets that she can live comfortably.

Q. And you paid --

A. She --

Q. – you've paid alimony for almost three years now?

A. Three years now, yes.

In December 2016, the Trial Court entered its final judgment of divorce. The Trial Court incorporated into its final judgment its findings of fact and conclusions of law rendered orally in August. The Trial Court granted Husband a divorce based upon Wife's inappropriate marital conduct. The Trial Court stated, in part, as follows:

> This is a divorce case. The husband is 57 years old. He is a practicing radiologist with an income at present of approximately $500,000 a year. The wife is a high school graduate and has been at all times during the marriage a housewife and stay-at-home mother. The parties have been married approximately 26 years. They have five children: Danika, Ashton, Ciana, Anya, and Tavyn. All children except Tavyn are adults and emancipated. Tavyn is currently 16 years of age.
>
> All issues are before the Court, that is to say the divorce and grounds for it, the division of property, spousal support claimed by the wife, custody, coparenting, and child support for the minor child, Tavyn. The divorce was filed in September, on September 12th of 2013. An unfortunate series [of] events caused the case to be substantially delayed. The parties had arranged for a custody evaluation for the children. There was more of them than just Tavyn at the time that were minors.
>
> ***
>
> Anyway, the parties tried and tried and tried to get a custody evaluation done and, for various reasons, just couldn't get one done, and that caused the case to be delayed. There were two temporary support orders entered in the case, one November the 1st of 2013. That was an agreed order reached at mediation. It provided that the husband would pay all the household expenses for the wife and children. The Court observes that also at the time, and today indeed, that the wife's mother was living in the marital home at the time. It provided the husband pay all those

-6-

expenses plus the sum of $2,100 a month. Then in 2015, September 17th, there was another order entered, and this order was entered on motion of notice by the wife. The husband and counsel were not present for the hearing. Husband's counsel had filed a notice of unavailability the day before the hearing but had not gotten the Court's permission for a continuance of the matter. In any event, the Court signed a new temporary support order. That order gave the wife possession of the house and ordered the husband to pay household expenses and increased support from $2,100 a month to $6,000 a month. That's kind of a thumbnail sketch of the type of case and the procedural history.

\*\*\*

Property division has a number of factors that the Court is to consider. They're set out in 36-4-121. The Court will not detail those factors, at least, because it is -- was and is, in the Court's opinion, appropriate from the beginning in this case to divide the property 50/50. This is a long-term marriage, 26 years. The statute tells us that the contributions of one party as a spouse are -- or homemaker are to be considered equal to the contributions of the other spouse who is the breadwinner. Here, certainly the husband is a hard worker, extraordinarily good provider, no question about that; but, on the other hand, the evidence here is that mother has been a good mother and at least until approximately 2012 a good homemaker, and this marriage, though with some problems, minor in nature as the Court sees them, quite successful until 2012.

\*\*\*

The Court will first address the matter of credibility of the witnesses, and on the critical and the disputed issues as between the husband and the wife the Court must certainly accredit the husband's testimony and cannot fully accredit or accredit the wife's. The record contained several instances which demonstrate to the Court the wife's lack of credibility. To her credit, at the time of trial she certainly admitted, did not deny, the fact that she had been carrying on an extramarital affair that began in July, August of 2012.

\*\*\*

Move on to the issue of alimony, this was and is a particularly contentious, difficult issue as between the parties and for the Court. In the first instance we have a statute, TCA 36-5-121, which sets out certain

-7-

factors which must be considered by the Court in matters involving alimony, several of the factors.

First of all, the Court observes that there is no question here but the wife is economically disadvantaged within the meaning of the statute. There just is no question about that. The husband is a medical doctor, earns half a million dollars a year because of his very hard work schedule and the success that he's made himself. On the other side of the coin, the wife is a high school graduate only and has not worked outside the home at least in some 26 years. So there just is no question but that the wife is economically disadvantaged as compared to the husband.

***

The wife testified at her deposition that she wanted to get a two-year degree and to become a medical assistant. As the Court observed earlier, she's in excellent health and could do that. The Court concludes that the wife can and should be rehabilitated to the degree possible under the circumstances.

***

The Court also notes, by the way, in this that in five years the husband will be -- rather, the wife will be 55 years old; the husband will be 62. There was evidence at the trial to the effect that the parties had seen a financial adviser back in 2012 and that, at least from the husband's viewpoint, that they had agreed that "Look, we need to embark on a plan here that will allow me to retire in the year 2017," that is, five years from 2012. And there was some evidence to the effect that "In order to get that accomplished, we need to get ahold of our expenditures and not spend so much." There's also evidence to the effect that the wife did not agree with that and, perhaps not coincidental, that it was 2012 when, according to the wife, that the parties began to drift apart. And it was certainly in 2012 when the wife began the affair with Mr. Hopson.

The Trial Court ordered Husband to pay Wife $3,500 per month in rehabilitative alimony for 60 months. The Trial Court ordered the respective sides to pay their own attorney's fees. Regarding child support, the Trial Court imputed to Wife an income of $29,300 per year. Wife was named primary residential parent of the parties' minor child. Wife timely appealed to this Court.

## Discussion

Although not stated exactly as such, Wife raises the following issues on appeal: 1) whether the Trial Court erred in its allocation of the debts of the parties; 2) whether the Trial Court erred in its award of rehabilitative alimony to Wife instead of alimony in futuro and whether the Trial Court erred in the amount of alimony awarded to Wife; 3) whether the Trial Court erred in imputing income to Wife for purposes of calculating child support; and 4) whether the Trial Court erred in not awarding Wife her attorney's fees as alimony in solido.

We first address whether the Trial Court erred in its allocation of the debts of the parties. Wife takes issue with being allocated one-half of three debts: two debts on cars purchased by Husband for two of the parties' children, and a life insurance policy. Wife was ordered to pay $10,000, $11,000, and $30,000, respectively, on these debts. Notably, Wife received slightly over one million dollars net in the overall division of the marital estate. Wife nevertheless argues that these particular debts were not incurred to her benefit and that she should not have to pay them. Wife also testified that Husband bought three cars for the children after the divorce was filed, and that the insurance policy was purchased at the beginning of the litigation. We have stated regarding division of marital debt:

> Marital debt, like marital property, should be divided equitably in accordance with the factors in Tenn. Code. Ann. § 36-4-121(c) and in light of (1) which party incurred the debt, (2) the purpose of the debt, (3) which party benefitted from incurring the debt, and (4) which party is better able to repay the debt. *See Cutsinger v. Cutsinger*, 917 S.W.2d at 243; *Mahaffey v. Mahaffey*, 775 S.W.2d at 623-24. Marital debts need not be divided in precisely the same manner as the marital assets, although they frequently follow their related assets. *See Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989); *Mansfield v. Mansfield*, No. 01A01-9412-CH-0058, 1995 WL 643329, at *9 (Tenn. Ct. App. Nov. 3, 1995) (No Tenn. R. App. P. 11 application filed).

*Kinard v. Kinard*, 986 S.W.2d 220, 233 (Tenn. Ct. App. 1998). As noted by this Court in *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998) (quoting *Roseberry v. Roseberry*, No. 03A01-9706-CH-00237, 1998 WL 47944, at *4 (Tenn. Ct. App. Feb. 9, 1998), *no appl. perm. appeal filed*), when dividing marital property:

The trial court's goal in every divorce case is to divide the parties' marital estate in a just and equitable manner. The division of the estate is not rendered inequitable simply because it is not mathematically equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988), or because each party did not receive a share of every item of marital property. *Brown v. Brown*, 913 S.W.2d [163] at 168.... In the final analysis, the justness of a particular division of the marital property and allocation of marital debt depends on its final results. *See Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. App. 1990).

In the present case, we simply do not find that the Trial Court's allocation to Wife of part of these debts in any sense renders the overall roughly 50/50 division of the marital estate inequitable. Both parties walk away with approximately one million dollars in assets as a result of the Trial Court's division. We decline Wife's invitation to tweak what is an overall equitable division of the marital estate including allocation of marital debt. We affirm the Trial Court in its allocation of marital debts in its overall division of the marital estate.

We next address whether the Trial Court erred in its award of rehabilitative alimony to Wife instead of alimony in futuro and whether the Trial Court erred in the amount of alimony awarded to Wife. Wife argues that the Trial Court's award of rehabilitative alimony of $3,500 per month for 60 months was insufficient, that Wife never realistically will be able to achieve on her own a standard of living comparable to that she enjoyed during the marriage, and that alimony in futuro is necessary to sustain her going forward. Our Supreme Court has discussed as follows regarding the different types of alimony available in Tennessee:

This Court has frequently recognized that trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award . . . .

***

Tennessee recognizes four distinct types of spousal support: (1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1) (2010 & Supp. 2012). Alimony in futuro, a form of long-term support, is appropriate when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible. *Gonsewski*, 350 S.W.3d at 107. Alimony in solido, another form of long-term support, is typically awarded to adjust the distribution of the marital estate and, as such, is generally not

-10-

modifiable and does not terminate upon death or remarriage. *Id*. at 108. By contrast, rehabilitative alimony is short-term support that enables a disadvantaged spouse to obtain education or training and become self-reliant following a divorce. *Id*.

Where economic rehabilitation is unnecessary, transitional alimony may be awarded. Transitional alimony assists the disadvantaged spouse with the "transition to the status of a single person." *Id*. at 109 (internal quotation marks omitted). Rehabilitative alimony "is designed to increase an economically disadvantaged spouse's *capacity* for self-sufficiency," . . . .

\*\*\*

Tennessee statutes concerning spousal support reflect a legislative preference favoring rehabilitative or transitional alimony rather than alimony in futuro or in solido. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Gonsewski*, 350 S.W.3d at 109. Not even long-term support is a guarantee that the recipient spouse will be able to maintain the same standard of living enjoyed before the divorce because "two persons living separately incur more expenses than two persons living together." *Gonsewski*, 350 S.W.3d at 108 (quoting *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). Although the parties' standard of living is a factor courts must consider when making alimony determinations, *see* Tenn. Code Ann. § 36-5-121(i)(9), the economic reality is that the parties' post-divorce assets and incomes often will not permit each spouse to maintain the same standard of living after the divorce that the couple enjoyed during the marriage. *Gonsewski*, 350 S.W.3d at 113. Decisions regarding the type, length, and amount of alimony turn upon the unique facts of each case and careful consideration of many factors, with two of the most important factors being the disadvantaged spouse's need and the obligor spouse's ability to pay. *Id*. at 109-10.

*Mayfield v. Mayfield*, 395 S.W.3d 108, 114-16 (Tenn. 2012).

As articulated by our Supreme Court in *Mayfield*, there is in Tennessee a statutory preference for rehabilitative or transitional alimony over alimony in futuro or alimony in solido. The characteristics of rehabilitative and transitional alimony are established by statute as follows:

(e)(1) Rehabilitative alimony is a separate class of spousal support . . . . To be rehabilitated means to achieve, with reasonable effort, an earning

capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

(2) An award of rehabilitative alimony shall remain in the court's control for the duration of such award, and may be increased, decreased, terminated, extended, or otherwise modified, upon a showing of a substantial and material change in circumstances. For rehabilitative alimony to be extended beyond the term initially established by the court, or to be increased in amount, or both, the recipient of the rehabilitative alimony shall have the burden of proving that all reasonable efforts at rehabilitation have been made and have been unsuccessful.

(3) Rehabilitative alimony shall terminate upon the death of the recipient. Rehabilitative alimony shall also terminate upon the death of the payor, unless otherwise specifically stated.

***

(g)(1) Transitional alimony means a sum of money payable by one (1) party to, or on behalf of, the other party for a determinate period of time. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.

(2) Transitional alimony shall be nonmodifiable unless:

(A) The parties otherwise agree in an agreement incorporated into the initial decree of divorce or legal separation, or order of protection;

(B) The court otherwise orders in the initial decree of divorce, legal separation or order of protection; or

(C) The alimony recipient lives with a third person . . . .

-12-

(3) Transitional alimony shall terminate upon the death of the recipient. Transitional alimony shall also terminate upon the death of the payor, unless otherwise specifically stated in the decree.

Tenn. Code Ann. § 36-5-121 (2017).

It is undisputed that Wife is the economically disadvantaged spouse. In addition, this was a marriage of quite some duration—over 25 years. These factors would tend to support an award of alimony in futuro. Other factors, however, weigh against such an award of long-term support. For one thing, the Trial Court found specifically that Wife is in excellent health, and could in time enter the workforce. Also, there is the issue of Husband's plan to retire from his lucrative career, which naturally would affect his ability to pay. The Trial Court observed that perhaps it was not coincidental that Wife began her affair around the time she learned of Husband's plan to retire.

Wife disputes Husband's account, but the Trial Court found Husband to be credible and Wife not credible. We extend strong deference to a Trial Court's credibility determinations. "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). We, therefore, accredit Husband's version of events.

Wife essentially triggered this divorce. It was legitimate for the Trial Court to factor this history into its decision-making regarding spousal support including both the type and the amount. The evidence does not preponderate against any of the Trial Court's findings. Our standard of review on the alimony issue being abuse of discretion, we find the Trial Court did not commit reversible error in declining to award Wife alimony in futuro or in the amount of rehabilitative alimony awarded. While the rehabilitative alimony awarded by the Trial Court will not transform Wife entirely from being economically disadvantaged, it will enable her to increase her capacity for self-sufficiency. *Mayfield*, 395 S.W.3d at 115. Here, the Trial Court found that rehabilitative rather than alimony in futuro or transitional alimony is necessary and appropriate. Applying all the relevant statutory factors to the Trial Court's findings in this case along with the Trial Court's division of the marital estate, we find the result to be neither illogical nor unjust.[1] We disturb neither the type, amount, nor duration of the alimony as awarded by the Trial Court.

---

[1] Husband does not request on appeal that the alimony awarded be modified in any way.

-13-

We next address whether the Trial Court erred in imputing income to Wife for purposes of calculating child support. Regarding imputing income for child support purposes, we have stated:

> The Tennessee Child Support Guidelines provide that income may be imputed to a parent when the court determines that the parent is voluntarily underemployed. *Wadhwani v. White*, No. M2015-01447-COA-R3-CV, 2016 WL 4579192, at *13 (Tenn. Ct. App. Aug. 31, 2016) (citing Tenn. Comp. R. & Regs. 1240-02-04-.04). The guidelines provide factors to be considered when determining whether a parent is willfully and voluntarily underemployed or unemployed. *Richardson v. Spanos*, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005). The factors include, *inter alia*, the parent's past and present employment; the parent's education, training, and ability to work; the parent's role as stay-at-home parent; and any additional factors deemed relevant to the particular circumstances of the case. *See* Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii).
>
> The issue of voluntary underemployment is a question of fact that requires careful consideration of all the attendant circumstances. *Owensby v. Davis*, No. M2007-01262-COA-R3-JV, 2008 WL 3069777, at *4 (Tenn. Ct. App. July 31, 2008) (citing *Richardson*, 189 S.W.3d at 726). We afford the trial court considerable discretion in this determination. *Thayer v. Thayer*, No. M2015-00194-COA-R3-CV, 2016 WL 4056316, at *4 (Tenn. Ct. App. July 26, 2016) (citing *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001)). "The trial court's decision is entitled to a presumption of correctness, particularly 'when it is premised on the trial court's singular ability to ascertain the credibility of the witnesses.' " *Id.* (citing *Reed v. Steadham*, No. E2009-00018-COA-R3-CV, 2009 WL 3295123, at *2 (Tenn. Ct. App. Oct. 14, 2009)).

*Ghorashi-Bajestani v. Bajestani*, No. E2016-00063-COA-R3-CV, 2017 WL 809880, at *9 (Tenn. Ct. App. March 1, 2017), *no appl. perm. appeal filed*.

The Trial Court imputed to Wife an annual gross income of $29,300 for child support purposes. However, the Trial Court also found that Wife could become a full-time student and earn a two-year degree to become a medical assistant. This clearly was the basis for the Trial Court's award of rehabilitative alimony. We find it difficult to square these findings. The one minor child was 16 at the time of trial. Wife had been a stay-at-home mother for decades, and she never earned any income during the marriage. If Wife is to be a full-time student for two years to increase her capacity for self-sufficiency, it is unrealistic and illogical to suppose she could work a full-time job during

-14-

those two years as well.  We vacate this portion of the Trial Court's ruling, and child support is to be recalculated without imputing any income to Wife for that two year period.

The final issue we address is whether the Trial Court erred in not awarding Wife her attorney's fees as alimony in solido.  Regarding attorney's fees as alimony in solido, our Supreme Court has stated:

It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido.  *See* Tenn. Code Ann. § 36-5-121(h)(1) ("alimony in solido may include attorney fees, where appropriate"); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996).  The decision whether to award attorney's fees is within the sound discretion of the trial court.  *Crabtree*, 16 S.W.3d at 361; *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995).  As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i).  A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997).  Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, *see Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, *see Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980).  Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony. *See id*. at 185.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn. 2011).

Wife argues in her brief on appeal as follows: "It is clear that the Wife does not have sufficient funds to pay her legal expenses and would have to deplete her resources awarded in this divorce action to pay her legal expenses."  Wife seeks the following:

[T]hat Husband be ordered to reimburse her for the attorney fees that she has expended in this cause which would be $10,000.00, which is one-half the amount previously ordered by the trial court, this $10,000.00 reflecting the Wife's portion of the parties joint tax refund and in addition, the $3,000.00 amount Wife paid subsequent to the $20,000.00 ordered by the

trial court in the Order Granting Exclusive Occupancy of the Marital Home, Increase in Spousal Support and Award of Attorney Fees and Professional Fees filed on September 17, 2015 and subsequently modified by an Agreed Order filed on October 6, 2015.

Husband, for his part, testified at trial that he already paid Wife's attorney's bill in the amount of $20,000. Moreover, Wife's assertion that she lacks sufficient funds to pay her legal expenses is not supported by the evidence. We disagree with Wife's implicit position that an economically disadvantaged spouse automatically is entitled to an award of attorney's fees as alimony in solido. That would negate the discretionary nature of the award, and Wife has failed to identify any abuse of discretion resulting in reversible error by the Trial Court. We affirm the Trial Court in its declining to award Wife attorney's fees as alimony in solido.

In summary, we vacate that portion of the Trial Court's decision imputing income to Wife for child support purposes, and child support is to be re-calculated accordingly. We affirm the Trial Court on all other issues.

## Conclusion

The judgment of the Trial Court is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs below and such further proceedings as are necessary and consistent with this Opinion. The costs on appeal are assessed one-half equally against the Appellant, Stacy Lynn Santee, and her surety if any, and the Appellee, Robert Harvey Santee.

_____
D. MICHAEL SWINEY, CHIEF JUDGE